## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| **DAWN C. POLK**<br><br>        **Plaintiff,**<br><br>v.<br><br>**NATIONAL RAILROAD PASSENGER CORPORATION D/B/A AMTRAK,** *et al*.,<br><br>        **Defendants.** | **Case No. 1:21-cv-01740-LKG** |

## NATIONAL RAILROAD PASSENGER CORP.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND IN OPPOSITION TO PLAINTIFF'S MOTION TO AMEND DEMAND AMOUNT AND <u>SUPPLEMENT COMPLAINT</u>

Defendant, National Railroad Passenger Corporation d/b/a Amtrak (hereinafter, "Defendant" or "Amtrak"), by and through its undersigned counsel, hereby moves to dismiss Plaintiff Dawn Polk's ("Plaintiff" or "Ms. Polk") claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and also opposes Plaintiff's Motion to Amend Demand Amount and to supplement her Complaint.

## I.    INTRODUCTION

Ms. Polk, *pro se*, sued her employer, Amtrak claiming that it breached two "contracts" with her relating to her failure to produce a sufficient urine sample for a drug test in 2019, and that "excessive" drug testing required of her caused her emotional distress. As almost an after-thought, Ms. Polk adds conclusory allegations under Title VII of the Civil Rights Act of 1964 ("Title VII"), simply because she identifies as African American.

Plaintiff's claims are preempted by the Railway Labor Act, which divests a court of subject matter jurisdiction when the interpretation of a collective bargaining agreement between a union and a railroad is required for the resolution of claims. Plaintiff's claims stem directly from the provisions of a collective bargaining agreement between Amtrak and her union regarding drug testing, meaning this Court lacks subject matter jurisdiction to hear them. Even if not preempted, Plaintiff has failed to state a claim. Her breach of contract claims fail under Maryland law and her Title VII claims are insufficiently plead and/or untimely. Finally, Plaintiff's claim for infliction of emotional distress is preempted by the Federal Employers' Liability Act and does not state a claim under that Act or Maryland common law.

As such, Amtrak requests that the Court dismiss Plaintiff's Complaint in its entirely with prejudice. Any chance to replead would be futile given that Plaintiff's claims are preempted.

## II.    RELEVANT BACKGROUND FACTS AND PROCEDURAL HISTORY

Ms. Polk was an employee of Amtrak and a member of the Sheet Metal Air Rail and Transportation Workers Conductors NEC ("SMART") labor union. *See* Complaint, Doc. 1 at p. 9 (referencing Plaintiff's union status) and Doc. 1-1 (email string between Amtrak and SMART regarding Plaintiff). Ms. Polk's employment was governed by a collective bargaining agreement ("SMART CBA") between Amtrak and SMART. *See* Declaration of Eric Dartt ("Dartt Decl."), Exhibit A.[1] Amtrak terminated Ms. Polk after she failed to produce a sufficient urine sample for a drug test, but she was reinstated pursuant to a waiver of investigatory hearing agreement dated April 19, 2019 (the "Waiver Agreement") in which she agreed to work with a Substance Abuse Professional and undergo periodic follow-up drug testing following reinstatement. *See* Doc. 1-1 a

---

[1] As will be discussed below, because this motion challenges the Court's subject matter jurisdiction, the Court may consider the CBA without converting the motion to one for summary judgment.

pp. 3-4.

### A.    Plaintiff's Complaint

Ms. Polk filed her Complaint on July 12, 2021. *See* Doc. 1. On September 20, 2021, Ms. Polk attempted to serve the Complaint, along with a Summons, upon Amtrak by having the U.S. Marshals serve counsel for Amtrak via U.S. Mail.[2] Ms. Polk alleges Amtrak briefly terminated her employment in violation of the terms of its Drug and Alcohol Free Workplace Program (the "Drug Testing Program") and conducted "excessive" follow-up testing pursuant to a Waiver Agreement which set forth the terms of her reinstatement. Ms. Polk makes claims for: (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) breach of contract; (3) wrongful termination in violation of Title VII; (4) retaliation in violation of Title VII; (5) harassment in violation of Title VII; and (6) emotional distress.

Ms. Polk's factual allegations are based on two "contracts" she contends Amtrak breached. The first is the Drug Testing Program, a portion of which Ms. Polk submitted with her Complaint. *See* Doc. 1-1, pp. 8-9. Ms. Polk erroneously believes the Program provided for a repeat drug test, and that she was denied that test. *Id.* at p. 6; Doc. 1-1 at p. 9. The second "contract" Ms. Polk contends Amtrak breached is the Waiver Agreement. *See* Doc. 1-1 at pp. 3-4. Ms. Polk contends she was "excessively" tested beyond the scope of the Waiver Agreement (seven times over nine months). Doc. 1 at p. 8; Doc. 1-1 at p. 2. Ms. Polk claimed in her original Complaint that she filed a "report" with Amtrak's Dispute Resolution Office ("DRO"), but provided no details at all about the nature of her report or when she made it. Doc. 1 at p. 6.

Ms. Polk also alleges she was drug tested at times that violated the Federal Railroad

---

[2] To Amtrak's knowledge, Plaintiff has not properly served the Summons and Complaint upon any individual Defendant.

Administration's Hours of Service Act. Doc. 1 at p. 8.[3]

**B.    Plaintiff's Motion to Amend Her Original Demand**

On October 12, 2021, Ms. Polk filed a motion seeking to amend her damages demand from $1 million to $2.5 million. Doc. 24. In that Motion, Ms. Polk reiterates the allegations of her Complaint and seeks additional damages for "physical, emotional, psychological and intentional infliction of emotional distress" that was purportedly caused by "excessive drug testing without just cause or warrant." *Id.* at pp. 1, 6.

**C.    Plaintiff's Supplements to the Complaint**

On October 12, 2021, Ms. Polk also filed four "supplements" to her Complaint, without leave of Court. *See* Doc. 28 (124-page "Plaintiff's Supplement to Complaint), Doc. 29 (102-page "Additional Supplemental Documents to Plaintiff's Complaint"), Doc. 31 (14-page "Supplement to Complaint"), and Doc. 32 (8-page "Supplement to Complaint"). In these 248 pages of supplements, Ms. Polk makes no mention of any harassment or discrimination relating to her race or retaliation. In fact, Ms. Polk does not discuss her race or the race of any other person anywhere in her four supplements. (*See id.*)

Rather, Ms. Polk reiterates and expands upon the allegations in her original Complaint, *i.e.*, that Amtrak purportedly breached two contracts with her and caused her emotional distress by "excessively" drug testing her. (*See generally id.*) Ms. Polk also provides details about a prior workplace injury (that is not the subject of her claims in this matter) and complains that the unannounced drug tests interfered with her ability to attend physical therapy. *See* Doc. 31 at p. 2.

---

[3] There is no private right of action under the Hours of Service Act. *See*, *e.g.*, *Capriotti v. Cosol. Rail Corp.*, 878 F. Supp. 429, 433 (N.D.N.Y. 1995). Penalties for violations are imposed by the Secretary of Transportation, and a civil action may be instituted by the Attorney General. 49 U.S.C. §§ 21103, 21303.

Ms. Polk also reconfirms that her claim for emotional distress is based on the purported "breach" of the Drug Testing Program. Doc. 31 at p. 5. Finally, Ms. Polk provides details that were missing from her original Complaint regarding her DRO report. Specifically, she explains that she filed it on February 4, 2021, *i.e.*, <u>after</u> the last drug test at issue. Doc. 28 at p. 12; *see also* Doc. 1-1 at 2. In addition, Ms. Polk attached a copy of the DRO report to one of her supplements. Doc. 28 at pp. 75-76. As in this action, Ms. Polk complained to the DRO that she was subjected to drug tests beyond the scope of her "agreement" and in violation of the Drug Testing Program and "hours of service" rules. *Id*. Ms. Polk did not mention race. *See id.*

Throughout her supplements, Ms. Polk also makes allegations that are completely untethered to her claims in this matter. For example, she complains she could not collect vacation pay and sick pay at the same time (Doc. 28 at p. 4) and that Defendant Tracey Armstrong once ordered her to work at an early hour, prompting her to file a DRO complaint against him. *Id.* at pp. 15-16.

### D. Amtrak's Drug Testing Program and the Applicable Provisions of the SMART CBA

As discussed above, Ms. Polk claims Amtrak breached its Drug Testing Program and the Waiver Agreement. A complete copy of the Drug Testing Program is attached to the Dartt Decl. as Exhibit B.[4] The express terms of the Drug Testing Program inform employees that the consequences of a violation (or apparent violation) by a union member will be determined by and handled pursuant to the applicable CBA. *See id*. at Section C ("Drug and Alcohol Testing Procedures") at §§ 3.0 and 5.0. The SMART CBA includes comprehensive terms governing

---

[4] Because Plaintiff attached a portion of the document to her Complaint, the Court may consider the entire document on this Motion to Dismiss without converting it to one for summary judgment. *Jones v. Wormuth*, no. ADC-21-860, 2021 WL 4290486 at *4 (D. Md. Sept. 21, 2021), citing *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

discipline of union employees. *See id.*, Ex. A. at Rule 25. In addition, two appendices of the SMART CBA apply specifically to alcohol and drug violations. *See id.* at "Rule 'G' Bypass Agreement"[5] and "Prevention Program Companion Agreement." Together, they create a comprehensive scheme for drug testing of union employees, set forth the consequences of a violation, and govern any ensuing disciplinary action. *See id.*

Waiver agreements are specifically provided for in the Drug Testing Program. *See* Dartt Decl., Ex. B at Section A, at § 8.0 and Appendix 1 at "Alcohol and Drug Waiver Agreement (NRPC 2585)"). The specific provisions for Waiver Agreements for SMART union members, including Ms. Polk, are set forth in "Rule 'G' Bypass Agreement" and "Prevention Program Companion Agreement" appendices to the SMART CBA. *See id.*, Ex. A.

## III.    STANDARD FOR MOTION TO DISMISS

A motion to dismiss for lack of subject matter jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(1). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *accord Schneider v. Donaldson Funeral Home, P.A.*, 733 F. App'x 641, 644 (4th Cir. 2018) (on a challenge to jurisdiction, "the district court can "go beyond the allegations of the complaint … without converting the motion to a summary judgment proceeding," and no evidentiary hearing is required if the question can be decided on the record). A motion brought pursuant to Rule 12(b)(1) should

---

[5] The name "Rule G" comes from where alcohol and drug use were traditionally addressed in railroad training manuals. Rule G remains in the Northeast Operating Rules Advisory Committee ("NORAC") Operating Rules and is also written into federal law at 49 C.F.R. §§ 219.101-102. The CFR's prohibitions on alcohol and drug use are still referred to as "Rule G" in industry parlance and in portions of the regulations themselves. *See*, *e.g.*, 49 C.F.R. § 219.105(d).

be granted "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (internal quotation marks and citation omitted). The plaintiff bears the burden of proving that subject matter jurisdiction exists. *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008).

Dismissal for failure to state a claim pursuant to Federal Rule 12(b)(6) is proper if the factual allegations are not "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim must be plausible on its face. *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. at 1949. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *Iqbal*, 129 S. Ct. at 1949. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

## IV.    ARGUMENT

### A.    Plaintiff's Claims are Preempted by the Railway Labor Act

The Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, *et seq*., is intended "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252, 114 S.Ct. 2239 (1994). Federal policy favoring arbitration "has special importance in the rail and air industries, where failure to resolve labor disputes in a 'prompt and orderly' manner may 'interrupt[] . . . commerce' and thus adversely affect the public interest in traveling and shipping." *Air Line Pilots Ass'n v. U.S. Airways Grp.*, 609 F.3d 338, 341 (4th Cir. 2010) (quoting 45. U.S.C. § 151a).

"Referring arbitrable matters to the [National Railroad Adjustment] Board . . . assur[es] that collective-bargaining contracts are enforced by arbitrators who are experts in 'the common law of [the] particular industry.'" *Consol. Rail Corp. (Conrail) v. Ry. Labor Exec. Ass'n*, 491 U.S.

299, 310, 109 S.Ct. 2477 (1989). "To realize this goal, the RLA establishes a mandatory arbitral mechanism" for two types of disputes, one of which is a "minor dispute." *Hawaiian Airlines*, 512 U.S. at 252. Minor disputes "grow out of . . . the interpretation or application of" a collective bargaining agreement and "involve 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" *Id*. 252-53 (citation omitted). Minor disputes also "implicate practices, procedures . . . or codes of conduct that are part of the working relationship," and "industry standards, and 'norm[s] that the parties have created but have omitted from the [CBA]'s *explicit* language." *Fry v. Airline Pilots Ass'n Intern.*, 88 F.3d 831, 836 (10th Cir. 1996) (emphasis in original); *see also Milam v. Herrlin*, 819 F. Supp. 295, 305 (S.D.N.Y. 1993) ("Claims arising out of 'minor' disputes are preempted by the RLA even when it appears that no specific provision of the collective bargaining agreement is directly applicable.").

An employer has a "relatively light burden" in establishing that a dispute is minor and subject to the RLA. *Conrail*, 491 U.S. 299 at 307 (citation omitted); *accord Connor v. LoveyBug, LLC*, Civil No. 1:20-cv-00425 (RDA/IDD), 2021 WL 2915400, at *6 (E.D. Va. July 12, 2021) ("The Fourth Circuit has recognized that airlines and other carriers under the RLA have 'a "light burden" to establish arbitrability under the RLA .'") (quoting *Ry*. *Labor Execs*. *Ass'n v. Chesapeake W*. *Ry*., 915 F.2d 116, 119 (4th Cir. 1990)).

Critically, neither the Court nor a jury may engage in any interpretation of the CBA. Under the RLA, interpretation of a CBA and the customary procedures used in enforcing it may be undertaken only by an arbitration board convened pursuant to the RLA. "[J]udicial incursion into what the RLA defines as the exclusive province of the RLA arbitration boards . . . would 'lead to evisceration of the grievance and arbitration procedures provided by the RLA.'" *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 664 (7th Cir. 2001). As such, state law claims that require interpretation

of a CBA are preempted, and such federal claims are precluded. *Id.* at 661-662. RLA preemption/preclusion is jurisdictional. *United Transp. Union v. South Carolina Pub. Ry. Comm'n*, 130 F.3d 627, 627-28 (4th Cir. 1997).

### 1.    Plaintiff's State Law Claims are Preempted by the RLA

Ms. Polk's state law claims are for (1) breach of contract and (2) the infliction of emotional distress.[6] State law claims that require CBA interpretation for their resolution are preempted by the RLA. *Hawaiian Airlines*, 512 U.S. at 261; *see also Brown*, 254 F.3d at 658 (where a "claim is grounded upon rights which stem from some source other than the CBA (such as state law), the claim will be preempted if it cannot be adjudicated without interpreting the CBA, or if it can be 'conclusively resolved' by interpreting the CBA").

Here, both "contracts" Ms. Polk seeks to enforce are inextricably intertwined with provisions of the CBA. The Drug Testing Program expressly references the terms of the CBA and requires that Amtrak follow the CBA in the event that a SMART union employee, like Ms. Polk, appears to be in violation of the program. The Waiver Agreement itself is a direct product of the CBA and governed by its terms. In order for the Court to resolve the question of whether either document constituted an individual contract between Ms. Polk and Amtrak and, if so, whether either was breached, the Court will need to interpret the terms of CBA itself. This exact scenario was the subject of a case before the Southern District of New York in *Milam*, *supra*. There, the plaintiff underwent a random drug test that yielded a positive result for opiates. 819 F. Supp. at 299. The plaintiff asked the railroad to submit his urine to a second test that he believed would show the original result was a false positive. *Id.* at 300. Like here, he asked that his disciplinary

---

[6] As will be discussed below, Plaintiff's claim for the infliction of emotional distress is preempted by the Federal Employers' Liability Act ("FELA"). However, even if it could properly be asserted under Maryland common law, it would be preempted by the RLA.

hearing be postponed and he signed a waiver agreement that provided for reinstatement, provided he followed a treatment program. *Id.* After a repeat test of his urine sample was negative, he sued the railroad and its agent for negligence and emotional distress. *Id.* The district court reviewed the CBA, the FRA's drug testing regulations (49 C.F.R. part 219) and the railroad's written testing program, and determined that the plaintiff's claims were preempted by the RLA. Not only were the terms of the CBA directly implicated, but so were the federal regulations it was premised upon. *Id.* at 302-303. In addition, the waiver agreement was an established "industry-wide" practice recognized by the FRA."[7] *Id.* at 302. In concluding that the plaintiff's claims for negligence and infliction of emotional distress were both preempted, the court explained that to allow a plaintiff to bring state law claims arising from federally mandated drug testing "would seriously undermine the effectiveness of the mandatory arbitration provisions in the RLA." *Id.* at 306. Courts in this circuit have come to the same conclusion. *See*, *e.g.*, *Carson v. S. Ry. Co.*, 494 F. Supp. 1104, 1112 (D.S.C. 1979) (plaintiff's state law claims arising out of how employer handled a suspected Rule G violation were preempted by the RLA); *Connor*, 2019 WL 2915400 at *8 (state law negligence claim arising from allegation of improper alcohol testing pursuant to a carrier's drug and alcohol testing protocol was preempted by the RLA).

---

[7] Drug testing for railroad employees is extensively regulated by the FRA. The Code of Federal Regulations includes a comprehensive regulatory scheme promulgated by the FRA that governs all aspects of railway safety, including drug and alcohol testing. *See* C.F.R. Title 49, Subtitle B, Chapter II. These federal regulations are not discretionary; Amtrak must comply with each and every regulation that applies to it. *See* 49 C.F.R. § 219.9. Among other things, this comprehensive regulatory scheme includes detailed regulations regarding drug testing procedures, waivers, hours of service law implications, and return-to-work processes. *See* 49 C.F.R. §§ 291.1–219.25; *see also* 49 C.F.R. § 40.11–40.29, §§ 40.191–40.193. Amtrak's Drug Testing Program references many of the applicable regulations (*see* Ex. B, Section A at § 8.0), and repeatedly references requirements of (and its compliance with) the FRA, Department of Transportation ("DOT") and Federal Motor Carrier Safety Administration ("FMCSA").

Ms. Polk's claims for breach of contract and infliction of emotional distress are like the plaintiff's claims in *Milam*, premised on the CBA, as incorporated into the Drug Testing Program and Waiver Agreement, all three of which are designed to comply with extensive federal regulations governing the railroad industry. As such, Ms. Polk's breach of contract claims are preempted by the RLA.

### 2. Plaintiff's Title VII Claims are Precluded by the RLA

Ms. Polk's Title VII claims for discrimination, harassment, and retaliation – each of which is expressly premised on how Amtrak carried out the Drug Testing Program and Waiver Agreement – are all likewise precluded by the RLA because they require interpretation of the CBA for resolution.

While the RLA does not, "*as a general rule*" bar claims arising under an "independent" federal statute, *e.g.*, Title VII, "this rule no longer applies if the federal claim asserted . . . depends for its resolution on the interpretation of a CBA. Such claims are not 'independent' of the CBA regardless of their source and are therefore precluded by the RLA." *Brown*, 254 F.3d at 667-68 (emphasis in original); *see also Lee v. Norfolk S. Ry. Co.*, 912 F. Supp. 2d 375, 379-80 (W.D.N.C. 2012) (holding that the RLA preempted a Section 1981 claim where the plaintiff claimed he was discriminated against "due to an erroneous application of the [CBA]" and was more severely disciplined than Caucasian employees); *Davis v. Am. Airlines*, 3:19-cv-44-MOC-DSC, 2019 WL 2719909, at *5 (W.D.N.C. June 28, 2019) (Title VII claim precluded where plaintiff alleged she should not have been required to undergo medical examination per her collective bargaining agreement); *Caldwell v. Norfolk S. Corp.*, No. 96CV443P, 1998 WL 1978291, at *3 (W.D.N.C. Mar. 3, 1998) (Title VII claim precluded by the RLA where plaintiff alleged defendant discriminated against him by not awarding a position to which he was entitled under the collective bargaining agreement).

Ms. Polk's Title VII claims are loosely premised upon a conclusory allegation that race was a factor in how Amtrak carried out follow-up drug testing after she executed the Waiver Agreement. Amtrak's legitimate, non-discriminatory business reasons for its decisions will be premised on the terms of the CBA as incorporated into the Drug Testing Program and Waiver Agreement, making the claims precluded by the RLA. The fact that a CBA may need to be interpreted on the issue of an employer's motivation under the traditional burden-shifting analysis used in employment discrimination cases does not remove the question of CBA interpretation from the RLA's preclusive/preemptive scope. *See*, *e.g.*, *Monroe v. Missouri Pac. R.R. Co.*, 115 F.3d 514, 518 (7th Cir. 1997) (federal/state law claims were preempted because any assessment of the employer's motivation for his termination required interpretation of a CBA); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485, 487 (5th Cir. 1996) (state law race discrimination claim was preempted because the CBA would have to be interpreted to show that the employer's stated reason for its conduct was pretextual); *Dotson v. Norfolk S. R.R. Co.*, 52 F. App'x 655, 658 (6th Cir. 2002) (holding that question of whether plaintiff should have been disciplined or was disciplined more harshly than others was preempted by the RLA because it depended on interpreting a CBA); *Lee*, 912 F. Supp. 2d at 377-80 (African American employee's claims that he was treated less favorably than Caucasian employees with respect to training opportunities and discipline were precluded because interpretation of the CBA was required); *Parker v. Metro. Transp. Auth.*, 97 F. Supp. 2d 437, 447 (S.D.N.Y. 2000) (federal and state discrimination claims were preempted because the CBA would have to be interpreted on the issue of pretext); *Moss v. Norfolk W. Ry. Co.*, No. 02-74237, 2003 WL 21817127, *5 (E.D. Mich. July 22, 2003) (holding plaintiff's race discrimination claim that he was discharged for the same conduct when a white employee was not depended on interpretation of CBA provisions regarding discipline and was, therefore, preempted by the RLA).

Because the Court will need to assess Amtrak's reliance on the express terms of the CBA as they relate to the conditions of the Waiver Agreement and Drug Testing Program in order to resolve Ms. Polk's Title VII claims, they are precluded by the RLA.

**B.    Even if Not Preempted, Plaintiff's Breach of Contract Claims Must Be Dismissed for Failure to State a Claim[8]**

**1.    Plaintiff Fails to State a Breach of Contract Claim Based on Amtrak's Drug Testing Program**

"Courts in Maryland apply the law of objective contract interpretation," under which "'[t]he written language . . . of an agreement will govern the rights and liabilities of the parties, . . . unless the written language is not susceptible of a clear and definite understanding.'" *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51 (2013) (quoting *Slice v. Carozza Props., Inc.,* 215 Md. 357, 368 (1958). "To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). "To be contractual under Maryland law, employment related pronouncements must make a commitment to provide a 'specific and definite benefit' to the person to whom the offer is made, should the offer be accepted." *Belyakov v. Medical Science & Computing*, 86 F. Supp. 3d 430, 438 (D. Md. 2015).

Ms. Polk fails to state a claim for breach of contract to the extent her claim is based on Amtrak's purported violation of its Drug Testing Program because, by its very terms, Amtrak owed

---

[8] As noted above, Amtrak is not aware of Ms. Polk having properly served any individual Defendant. Even if she did, her claims against them fail. Ms. Polk asserts that Andrew Collins "breached" Amtrak's Drug Testing Program. Doc. 31 at p. 2. As for Curtis Stencil and Alton Lamontonge, it appears Ms. Polk alleges they failed to prevent the purported "breach." *See id.* at 6. If the Program were a "contract" (which it is not), an individual is not liable for a breach unless they "authorized, assented to or ratified" the contract. *Pinsky v. Pikesville Rec. Council*, No. 299, Sept. term, 2015, 2017 WL 3326961 at *1 (Md. Ct. Spec. App. Aug. 4, 2017) (unreported).

Ms. Polk no contractual obligation and Amtrak breached no term of the program.

Section A at § 7.0 of the Drug Testing Program states:

> Changes to this policy can be made at Amtrak's discretion. Amtrak also expressly states that **this policy does not create a contract, promise or contractual right, express or implied**.

Ex. A at § 7.0 (emphasis added). Because the program, by its express terms, created no contractual rights and could be changed at Amtrak's discretion, Ms. Polk's breach of contract claim fails to state a claim to the extent it is premised on the program. *See Belyakov*, 86 F. Supp. 3d at 438 ("Generally, contracts 'must express with definiteness and certainty the nature and extent of the parties' obligations'").

Furthermore, Ms. Polk's claim is based on a misreading of the terms of the Drug Testing Program. Ms. Polk contends that the Program required Amtrak to offer her a second drug test after she was unable to provide a sufficient sample during her first test. *See* Doc. 1 at p. 6. However, the Program did not require Amtrak to offer Ms. Polk a second test. It states as follows:

> Unable to Provide Sample/Refusal to Test. Donors being tested in a Federal testing event MUST attempt to provide a specimen. If the donor is unable to provide a sample, the collector will contact Amtrak's DER [designated employer representative] to advise. If a specimen is not provided, the donor will be instructed by the DER to take a medical evaluation to determine if there is a medical reason for not providing a sample. If it is determined that there is no legitimate medical reason for not providing a urine specimen, it will be considered a refusal to test. The facility and/or collector MUST contact the DER prior to completing an alternative collection. Alternative collections can only be performed for non-Federal tests.

Ex. A at § 2.6. A second test is offered only in other, different circumstances. *See id.* at Appendix pp. 21-22 ("Confirmation Test" and "Drug Testing" definitions). Ms. Polk misreads the program's definition of "Refusal to Submit to a Test" (*see id*. at pp. 23-24) as a requirement for Amtrak to offer her a second test. The program's terms are clear and state no such thing.

In sum, even if the Drug Testing Program did constitute a contract – which it does not –

and even if Ms. Polk's breach of contract claim were not preempted by the RLA – which it is – the allegations of Ms. Polk's Complaint do not state a claim for breach of the Drug Testing Program.

### 2.     Plaintiff Fails to State a Breach of Contract Claim Based on the Waiver Agreement

Ms. Polk also claims that Amtrak violated the Waiver Agreement she executed by scheduling her for drug tests she contends were not required by it. *See* Doc. 1 at p. 7.  The Waiver Agreement's terms are simple. Amtrak agreed to reinstate Ms. Polk to work following her failure to provide an adequate drug testing urine sample, and not to proceed with an investigatory hearing relating to Ms. Polk's violation under the Drug Testing Program. *See* Doc. 1-1 at pp. 3-4. In return, Ms. Polk agreed to accept termination for a violation of the Drug Testing Program (*i.e.*, concede that her termination was warranted by the terms of the Drug Testing Program), work with a Substance Abuse Professional, submit to follow-up drug testing, and waive claims relating to entering into the Waiver Agreement. *Id.*

As Ms. Polk acknowledges in her Complaint, Amtrak fulfilled the obligations under the Waiver Agreement to return her to work and halt its investigation. *See* Doc. 1 p. 9 (acknowledging that Ms. Polk returned to work) and Doc. 1-1 at p. 7 (acknowledging that Amtrak's investigation did not proceed). Ms. Polk now seeks to have the Court read an additional, non-existent term into the Waiver Agreement, *i.e.*, that Amtrak would not submit Ms. Polk to any drug testing beyond that expressly required by the Waiver Agreement. The Waiver Agreement includes no such term. Moreover, the CBA, the Drug Testing Program, and federal regulations all provide for additional drug testing on numerous bases. *See* Dartt Decl., Ex. A at Appendices; *id.* at Ex. B *generally*; and 49 C.F.R. parts 40 and 219. Ms. Polk and Amtrak did not – and could not have – entered a contract limiting drug testing to only what is provided for in the Waiver Agreement.

In sum, even if Ms. Polk's breach of contract claim based on the Waiver Agreement was not preempted, the allegations of the Complaint do not state a claim for breach of its terms.

## C.    Even if Not Precluded, All Title VII Claims Must Be Dismissed[9]

As discussed above, Plaintiff's Title VII claims are precluded by the RLA because they are inextricably intertwined with the terms of the CBA, which must be interpreted for their resolution. Even if Ms. Polk's claims were not precluded, they must nonetheless be dismissed for failure to state a claim and/or as untimely.

### 1.    Plaintiff's Claims are Untimely to the Extent They are Based on Her 6-Week Termination in 2019

Ms. Polk's own allegations defeat her claim for "wrongful termination" in violation of Title VII. Ms. Polk acknowledges that she was terminated for six weeks in April 2019 following her March 25, 2019 drug test. Doc. 1 at pp. 6, 8. Ms. Polk alleges she began the process of filing an EEOC charge on April 28, 2021. Doc. 1 at p. 6. Termination is a discrete act that starts the clock for filing an EEOC charge. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). A Title VII plaintiff must exhaust administrative remedies as to each "discrete act" claimed to be an unlawful employment practice. *Id.* at 110-111. Ms. Polk had 300 days after her termination to file a charge based on her termination. *See E.E.O.C. v. R&R Ventures*, 244 F.3d 334, 338 n.1 (4th Cir. 2001); 42 U.S.C. § 2000e-5(e)(1) (the time for filing a charge of employment discrimination begins when the discriminatory act allegedly occurs). Because Ms. Polk did not file her Charge until more than 300 days after her termination, she failed to exhaust that claim within the required time period and may not now pursue it. *See Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406

---

[9] Even if the individual Defendants were properly served, Plaintiff's Title VII claims as to them would all be subject to dismissal, because Title VII does not provide for individual liability. *See Lissau v. Southern Food Servs., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998). Furthermore, Plaintiff makes no allegations implicating any individual in a potential Title VII violation.

(4th Cir. 2013) ("federal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies").[10]

### 2. Plaintiff's Conclusory Allegation of Differential Treatment Based on Race Fails to State a Claim under Title VII

As to Ms. Polk's allegations that she was discriminated against, retaliated against, and harassed via "excessive" drug testing, she includes only conclusory facts or allegations to support a Title VII claim. Ms. Polk merely states that she is African American and concludes that she was treated differently than "other" employees. Doc. 1 at pp. 8-9. However, the Complaint does not include a single well-pled fact tying Ms. Polk's race to the drug testing she was required to undergo. *See id*. Ms. Polk does not allege that any comment was made regarding her race or that any decision-maker harbored discriminatory animus, and she does not identify a single employee who was treated differently under circumstances similar to her own. *See id*. The fact that Ms. Polk is African American is not, standing alone, sufficient to state a plausible claim for race discrimination, harassment or retaliation, because it does not "nudge" Ms. Polk's claim that she was subjected to differential treatment based on race "across the line from conceivable to plausible," as is required to meet the basic pleading standard of *Iqbal* and *Twombly*. *See Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. 1937. Furthermore, the fact that Ms. Polk does not mention race at all in the 248 pages of supplements she filed  confirms that she has no basis to state a claim based on race.

---

[10] In addition, Ms. Polk expressly accepted her termination in the Waiver Agreement and released Amtrak from any claims based upon her execution of that agreement. *See* Doc. 1-1 at pp. 3-4. Thus, even if her termination claim was the subject of a timely EEOC charge – which it was not – she has already released it in exchange for consideration, *i.e.*, reinstatement under the terms of the Waiver Agreement.

### 3.    The Conduct Plaintiff Alleges Does Not State a Claim for Hostile Work Environment Harassment

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prevail on a claim of racial harassment, a plaintiff must show that: "(1) [she] experienced unwelcome harassment; (2) the harassment was based on [her] race . . .; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Stoval v. H&S Bakery*, No. CV TDC-20-3234, 2021 WL 2580746, at *6 (D. Md. June 23, 2021) (citing *Baquir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006)).

Ms. Polk's allegation that she was subjected to follow-up drug tests beyond those specifically required by the Waiver Agreement simply does not rise to the level of actionable harassment, as it was not physically threatening or abusive and did not subject Ms. Polk to "discriminatory intimidation, ridicule, or insult." *See id.* (granting motion to dismiss and holding employer's increased surveillance of plaintiff, false accusation of refusal to take a drug test, written reprimands, and termination did not constitute harassment under Title VII). Thus, even if Ms. Polk alleged a single fact tying the follow-up drug testing to her race, which she does not, her allegations do not state a claim for harassment under Title VII.

### 4.    Plaintiff's Allegations Do Not Support a Retaliation Claim

Ms. Polk's retaliation claim is insufficiently plead because she identifies no protected activity. To prevail on a claim for Title VII relation, a plaintiff must establish that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a

causal connection existed between the protected activity and the asserted adverse action." *Nichols v. Harford Cty. Bd. of Educ.*, 189 F. Supp. 2d 325, 343 (D. Md. 2002). Nothing in the Complaint suggests Ms. Polk ever complained to Amtrak about discrimination or harassment based on race. In addition, the DRO complaint attached to Ms. Polk's supplement was *not* related to race. Doc. 28 at pp. 75-76. Because Ms. Polk does not suggest that she ever engaged in protected activity related to any protected category, her Complaint does not state a plausible claim for Title VII retaliation.

In sum, even if Ms. Polk's Title VII claims were not precluded by the RLA – which they are – they must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) and/or Federal Rule of Civil Procedure 12(b)(6), as appropriate.

> **D.    Plaintiff's Claim for Emotional Distress is Barred by and Fails to State a Claim Under the Federal Employers' Liability Act ("FELA"), and Also Fails to State a Claim Under Maryland Law**

> **1.    Plaintiff's Claim is Barred by the Exclusivity of the FELA**

Ms. Polk seeks to recover for "emotional distress" purportedly inflicted upon her by Amtrak. *See* Doc. 1 at p. 10. FELA provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. §51. Thus, FELA is the exclusive remedy for railroad employees as to all injuries arising out of the employment relationship. *New York Central R.R. Co. v. Winfield*, 244 U.S. 147, 151 (1917); *Janelle v. Seaboard Coast Line R.R. Co.*, 524 F.2d 1259, 1261 (5th Cir. 1975); *see also Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994) (FELA enacted to provide a remedy to railroad workers who sustain personal injuries as a result of the negligence of the railroad); *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561 (1987) (same).

Tort claims, including claims of infliction of emotional distress, are routinely held as

actionable against railroads only under FELA. *See Consol. Rail Corp*., 512 U.S. at 549-50 (negligent infliction of emotional distress claim actionable under FELA); *Higgins v. Metro-North R.R. Co*., 143 F. Supp. 2d 353, 361 (S.D.N.Y. 2001) (intentional infliction of emotional distress claim cognizable under FELA); *Teague v. National R.R. Passenger Corp.*, 708 F. Supp. 1344, 1354 (D. Mass. 1989) (holding intentional infliction of emotional distress claim was cognizable under FELA and, therefore, state law claim for intentional infliction of emotional distress preempted).

Because FELA provides Ms. Polk with the sole basis of redress for her allegations of emotional distress, her common law claim for emotional distress must be dismissed.

### 2. Plaintiff Fails to State a Plausible Claim for Intentional Infliction of Emotional Distress Under FELA's Zone of Danger Test

Even if Ms. Polk had properly pled a claim under FELA (which she did not), she cannot offer evidence to support such a claim. To establish an emotional distress claim under FELA, the alleged injury must satisfy the zone of danger test. *Consol. Rail Corp*., 512 U.S. at 556. The zone of danger test "limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Id*. at 548 collecting cases (emphasis added).

"Railroad employees thus will be able to recover for injuries–physical and emotional– caused by the negligent conduct of their employers that threatens them imminently with physical impact." *Id*. at 556. The zone of danger test governs an intentional infliction of emotional distress claim pled under FELA. *See Goodrich v. Long Island RR Co.*, 654 F.3d 190, 199 (2d. Cir. 2011) (holding that "[i]n light of FELA's overall focus on physical injuries … the zone of danger test applies to IIED claims brought under the FELA"); *Garmon v. Amtrak*, No. CA 13-516 ML, 2014 WL 198341, at *2 (D.R.I. Jan. 15, 2014) (noting "the common law zone of danger test applies to

claims of negligent infliction of emotional distress brought under FELA"); *Carmack v. National R.R. Passenger Corp.*, 486 F. Supp. 2d 58, 83 (D. Mass. 2007) (applying the zone of danger test to plaintiff's intentional infliction of emotional distress claim under FELA). Significantly, physical manifestation of symptoms resulting from emotional distress will not satisfy the zone of danger test. *See Waisonovitz v. Metro North Commuter R.R.*, 550 F. Supp. 2d 293 (D. Conn. 2008) (zone of danger test not met and emotional distress claim dismissed where train operator, who developed PTSD after hitting and killing coworker, did not sustain any physical impact to his body during or after collision). As the United States Supreme Court explained in *Consolidated Rail Corp.*, even a nervous breakdown resulting from too much work did not fall within the zone of danger test, and the Court would "not take the radical step of reading FELA as compensating for stress arising in the ordinary course of employment." 512 U.S. at 558; *see also Crown v. Union Pac. R.R. Co.*, 162 F.3d 984 (8th Cir. 1998) (finding the manifestation of physical symptoms insufficient to satisfy FELA's zone of danger requirement because "a physical impact or an immediate risk of physical impact is required, rather than merely a physical injury."); *Smith v. Union Pac. R.R. Co.*, 236 F.3d 1168 (10th Cir. 2000) (same); *Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 432 (1997) (noting that a "physical impact" does not encompass every form of physical contact); *Nelson v. Metro-North Commuter R.R.*, 235 F.3d 101, 110 (2d Cir. 2000) ("[A]n event cannot constitute a 'physical impact,' even if it entails contact, unless it has a physically harmful effect on the body").

Here, Ms. Polk simply alleges to have suffered emotional distress due to Amtrak's decisions regarding the frequency and timing of drug testing. *See* Doc. 1 at p. 10. As the case law cited above demonstrates, that is not sufficient to seek recovery from Amtrak for such purported harm. Thus, even if Ms. Polk had pled her claim under FELA, dismissal is appropriate.

**3.     In the Alternative, Plaintiff Fails to Identify Conduct Sufficiently Outrageous to Support A Tort Claim For Intentional Infliction Of Emotional Distress Under Maryland Law**

Under Maryland common law, a claim of intentional infliction of emotional distress has four elements: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, (1977). "Each of these elements must be pled and proved with specificity." *See Foor v. Juvenile Servs. Admin.,* 552 A.2d 947, 959 (Md. Ct. Spec. App. 1989). The second element requires that plaintiff allege misconduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris*, 380 A.2d at 614. In Maryland, workplace harassment "almost never rises to the level of outrageousness, almost never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim of intentional infliction of emotional distress under Maryland law." *Steele v. Johns Hopkins Health System Corp.*, no. JKB-19-3628, 2020 WL 4471710, at * 4 (D. Md. Aug. 4, 2020), quoting *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 466 (D. Md. 2002).

Ms. Polk alleges that she was subjected to follow-up drug tests that were not expressly required after "failing" an initial drug test. Nothing about these facts comes close to being extreme, "beyond all bounds of human decency," atrocious or "utterly intolerable in a civilized community," as is required to recover for the infliction of emotional distress under Maryland law. As such, even if Ms. Polk's claim was not preempted – which it is – it fails to state a claim and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

**E.     Plaintiff's Supplements Do Not Cure the Defects in Her Pleading and Her Motion to Amend Should Be Denied**

Plaintiff's Motion to Amend Demand Amount and her four supplements to the Complaint together essentially comprise a motion to amend her pleading. Because Ms. Polk filed her original Complaint on July 12, 2021, she is out of time to amend as of right. *See* Fed. R. Civ. P. 15(a)(1). However, the Federal Rules provide that a court "may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

Leave to amend is freely granted when justice requires. *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001). However, a motion to amend should be denied when the amendment would be futile. *Id.* Plaintiff's Motion to Amend Demand Amount and her four supplements are facially futile. They serve to confirm that Ms. Polk's breach of contract claims are premised on the Drug Testing Program and Waiver Agreement. Because those claims are preempted by the RLA and this Court lacks subject matter jurisdiction over them, any attempt to amend would be futile. In addition, even if these claims were not preempted, nothing in Ms. Polk's supplements cures the deficiencies in her attempt to plead a contract under Maryland common law, which, as discussed above, Ms. Polk's allegations fail to satisfy.

Ms. Polk's supplements also confirm that her Title VII claims are baseless (in addition to being precluded). In the four supplements she filed, Ms. Polk does not include any allegations relating to race. Thus, not only do the supplements add nothing to Ms. Polk's insufficiently pled Title VII claims, but they also demonstrate that, given multiple chances to set forth the basis for a Title VII claim, Ms. Polk has no facts to support such a claim.

Finally, nothing in Ms. Polk's supplements cures the defects in her claim for intentional infliction of emotional distress. It remains based on the drug testing that she was obligated to

undergo. Nothing in the supplements alters the conclusion that Ms. Polk's claim is preempted by FELA, would be insufficient to state a claim under FELA even if Ms. Polk had brought such a claim, and is insufficient to state a claim under Maryland common law.

## V.    CONCLUSION

For the foregoing reasons, Amtrak respectfully requests that the Court enter an Order denying Plaintiff's Motion to Amend Demand Amount and supplement her Complaint and dismissing Plaintiff's Complaint in its entirety with prejudice.

Dated: October 26, 2021

*/s/ Rosa T. Goodman*
Alison N. Davis (MD Bar No. 27987)
andavis@littler.com
Rosa T. Goodman (MD Bar No. 20739)
rtgoodman@littler.com
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006-4046
202.842.3400 (Telephone)
202.842.0011 (Facsimile)

*Counsel for Defendant National Railroad Passenger Corporation*