Case # 1:21-cv-01740-LKG

Dawn C. Polk

VS

Andrew Collins, et al.



On March 25th, 2019 I had a return to work drug test at Concentra. During the return to work drug test, I produced a urine specimen but it was not enough for a 2-split valve test. It was enough for 30cc's in one valve and a little less than required for the other valve. While at Concentra, I went every time my bladder indicated I had to urinate and it wasn't enough. I simply DID NOT hold my bladder until it was full enough to give enough for a split valve specimen. The time and information was documented by the Concentra representative and the defendant listed above was notified of the return to work drug test status. (see enclosed)

Prior to departing Concentra, I immediately called the defendant and I explained to him that I did not wait for my bladder to be full enough to produce enough specimen for a split valve test. I immediately stated to the defendant, I will come back to Concentra at 7:30 am, they open at 8:00 am and I will hold my bladder in the morning and produce enough for a split valve test. The defendant chuckled and replied, "You do not get another test", you must be evaluated for a shy bladder. I immediately replied, I do not have a shy bladder, I simply did not hold my bladder long enough for a split valve test. The defendant again, replied in a stern tone, "You do not get another test", "you need to be evaluated for a shy bladder and wait until I contact you with the day and time to return to Concentra for a shy bladder evaluation". I replied once again, I do not have a shy bladder, I simply did not hold my bladder long enough and every time my body indicated I had to urinate, I urinated. The defendant mentioned above remained adamant about not adhering to honoring the second drug test as it stated in the Amtrak Drug and Alcohol Policy of

2017, which I was governed under on March 25th, 2019. Under this policy, a second drug test is required and if the employee doesn't take a second drug test as directed then it is considered a refusal. This second test takes place before a shy bladder evaluation. When I came back to work on May 08th, 2019 and shared my unpleasant ordeal in great detail with my fellow coworkers, they all said, YOU WERE SUPPOSED TO GO BACK THE NEXT DAY FOR A SECOND TEST! I said I know and the Medical Release Officer denied me that opportunity. (see document enclosed)

In reference to the Amtrak Drug and Alcohol policy of 2017, bottom of page #24 of #27 (Refusing to Submit to a Test), top of page #25, it states Failing or declining to take a second drug test as directed. This process is stated before a shy bladder assessment is required. Failing or declining to take a second drug test as directed does not contain any detailed stipulations or detailed exceptions that an employee must meet or NOT meet in order NOT to receive the second drug test. I fell under this category of not providing enough urine for a return to work drug test and I should have been allowed to return the very next day on March 26th 2019 for a second return to work drug test. Yet; instill, the defendant listed above choose to disregard this part of the policy, denied me the second drug test and insisted I return on March 26th, 2019 for a shy bladder assessment instead.

Per the defendant's request, I returned to Concentra on March 26th, 2019 for a shy bladder assessment and the doctor's findings were documented that I did not have a shy bladder. I immediately requested a drug test after the shy bladder assessment because I had been holding my urine the entire morning. The Dr. Hong responded great, let me get you someone who can give you the test. Dr Hong went to get a Concentra drug test representative and she responded, she cannot just give me a drug test, Amtrak has to order it. I then called the defendant once more to receive another drug test before departing Concentra and I was denied the second opportunity per the defendant once more. The documents I received prior to departing Concentra after the shy bladder

evaluation stated QNS ONLY (quantity not sufficient only); no clinical signs of substance abuse. (see documents enclosed)

I then contacted my union representatives CJ Auvil and Rick Pauli to inform them about what had transpired with my return to work drug test and not receiving a second drug test the next day as the policy states. Within the first two weeks of my initial return to work drug test on March 25th, 2019, Labor Relations and my union representatives were all in agreeance that I am coming back to work from a work injury and that they see no problem with issuing a second return to work drug test. They immediately contacted the defendant mentioned above for the processing of a second return to work drug test paperwork and the defendant gave Amtrak Labor Relations and my union representatives complete resistance. The defendant mentioned above refused to issue or release the second return to work drug test documents to Amtrak Labor Relations and my union representatives.

As I waited to receive a second return to work drug test, I went to see my primary care doctor on April 4th, 2019. This was the first available appointment Dr. Ochaney had available. I showed him the documents from Concentra and I explained what recently transpired in regards to not waiting long enough for my bladder to get full enough for a two split valve return to work drug test and it is preventing me from getting back to work and that my job is looking to terminate my employment. I then requested Dr. Ochaney order the most extensive drug test he could. Dr. Ochaney wrote a script for Quest Diagnostics. The script included withdrawing (5) valves of blood from my arm and a full cup of urine. I held my urine until I met with my primary care doctor on this particular day and after leaving the doctor's appointment this very same day, I immediately headed to Quest Diagnostics to fulfill the script. (See document results enclosed)

As I am waiting for the negative test results to come back from Quest Diagnostics, I received a charging letter on April 4th, 2019 from Amtrak

management. (see document enclosed) The charging letter was a formal investigation in regards to my refusal to test during the return to work drug test on March 25th, 2019. The charging letter includes verbatim, copy and paste verbiage from the 2017 Amtrak Drug and Alcohol Policy at the top of page #25 (see notations enclosed).

At the recommendation of my union representative CJ Auvil, the postponement was requested and granted for April 07th, 2019.

As I continued to correspond with UTU General Chairmen via emails and phone calls, Rick Pauli, was in communication with Amtrak Labor Relations in regards to retrieving a second return to work drug test.

Rick and Amtrak Labor Relations were experiencing a lot of difficulty from the defendant mentioned above in regards to getting the documents they needed for the second return to work drug test. Because of this and the time it was taking to receive a second return to work drug test, I contacted the president and CEO of Amtrak at the time Richard Anderson. I contacted CEO Anderson and explained that I was trying to get back to work from a work injury and everything that transpired during my return to work drug test and the circumstances currently at hand around this matter. (see documents enclosed) I even attached all the documents from Concentra and Quest Diagnostics in the email sent to CEO Richard Anderson. Shortly after sending this email, I received a document via email from general chairmen, Rick Pauli and the agreement contained (9) stipulations I must adhere to in order to regain and keep my Amtrak employment. This document was from Glen Henson, Director of Amtrak Labor Relations and General Chairmen Rick Pauli. (see document enclosed) I was very offended by what was the agreement was portraying me as. The agreement was speaking as if I had a RULE G VIOLATION and that was NEVER the circumstance. I do NOT drink or do drugs and I NEVER had a RULE G VIOLATION in the 23 years I have been employed with Amtrak. This agreement had been derived under the assumption that the initial return to work drug test policy of 2017 had

been adhered to in it's entirety, which it wasn't; Nevertheless, I signed it on April 22nd, 2019 because I needed to get back to work.

Upon signing the egregious agreement for reinstated employment, I was required to meet with a SAP (Substance Abuse Person) in Philadelphia, PA by the name of Jackie Tillson. I met with Jackie Tillson twice as required. After meeting with Jackie Tillson the very first time, I was traveling back to Maryland via an Amtrak train and I came in contact with two coworkers, Victor Kyler and DrSugur Robinson. They both questioned as to why I was in there "neck of the woods" and I was completely transparent. When I told them both what had transpired with my work injury, the return to work drug test on March 25th, 2019 and everything that happened surrounding it, DrSugur Robsinson immediately replied, " FOR THE PAST YEAR, I HAVE BEEN WORKING IN THE AMTRAK DRUG AND ALCOHOL DEPARTMENT LIGHT DUTY WORK UNDER RIGHT CARE DAY ONE FOR MY SHOULDER INJURY IN SUNNY SIDE YARD; YOU WERE SUPPOSED TO GO BACK TO CONCENTRA THE NEXT DAY FOR A SECOND DRUG TEST! IF NO SPECIMEN GIVEN THE SECOND TEST, THEN, THEN YOU WERE TO BE EVAULATED FOR A SHY BLADDER!" I replied, I know Robinson, but the Medical Release Officer Andrew Collins denied me that opportunity. In regards to the meetings with Jackie Tillson, she required me to fill out EAP check in documents for 3 months. (see documents enclosed) Jackie Tillson was concerned that I had been through a lot emotionally in regards to the return to work drug test and she required me to continue to see an emotional health counselor via Amtrak's EAP department. I expressed to Jackie Tillson that I do not trust Amtrak's EAP department and I already have an outside emotional health counselor whom I have been seeing and still see to this day, by the name of Liz Herrick. A few weeks later, I was required to see Jackie Tillson again in Philadelphia a second time. After meeting with Jackie twice and once she verified I was seeing Liz Herrick, I was released from her care and to finally receive a 2nd return to work drug test on April 30th, 2019. After waiting approximately a week after the 2nd drug test, I was able to go back to

work on May 08th, 2019.

According to the Labor Relations agreement I signed, I should have received a minimum of (6) unannounced follow up drug tests in one year of consecutive service. I received a total of (4) follow up unannounced drug tests in that one year of May 08th, 2019 until May 08th, 2020. (see documents enclosed) In regards to the two follow up drug tests that occurred on March 02nd, 2020 and March 03rd, 2020; the one that occurred on March 02, 2020 I was the only one crew receiving a test and March 03rd, 2020 it was my entire crew: myself, Jenee Vincent and Lawrence Irving Jr. (This is why I counted 4 unannounced "follow up" drug tests instead of 5 prior to the May 08th, 2020 expiration in my summary complaint). During this one year, I worked jobs at Martin's and Baltimore crew base that would allow me to attend water therapy and physical therapy sessions after work as I was being treated for recent work injuries that occurred 08-07-2019 and 11-26-2019. When the Covid 19 pandemic occurred, the jobs and train schedules changed on March 17th, 2020. I always bided on a job that would still allow me to make the water and physical therapy sessions after work by 4:30 pm on Mondays, Wednesdays and Thursdays. The water therapy and physical therapy sessions I attended after work were conducive to my pain management scheduling and being able to go to work from day to day and do basic daily activities.

After the agreement I signed expired on May 08th, 2020, I received (7) additional, unannounced follow up drug tests. (see document enclosed) These (7) unannounced follow-up drug tests were a direct interference and hinderance with my water therapy and physical therapy treatments that I had scheduled after work on Mondays, Wednesdays and Thursdays. When I was held after work on these days for an unannounced follow up drug test, my knee pain became unbearable due to the fact I was missing my sessions after work. While missing my pain management sessions, I was unable to walk, do steps or just do basic daily activities; when the pain in my knee became excruciating, I took off work. A conductor job is

very physical, requires a lot of walking, walking on ballast, steps, coupling equipment, air hoses and walking on a moving train at 90, 110 or 125 mph.

When I received these unannounced follow up drug tests after the agreement expired, I was retaliated against, embarrassed and humiliated in front of my coworkers. According to the Amtrak Drug and Alcohol Policy of 2017 which I was governed under; it requires discretion and privacy when conducting a test and should be handled where other employees do not need to know. (see document page #19 and #20) Alcohol Testing.

I was retaliated against because the defendant listed above did not adhere to the FRA Hours of Service policy in which I was governed under. During these unannounced follow up drug tests after the May 08th, 2020 expiration, my job did NOT contain a respite of 4 hours. My job signed up at 4:40 am and it was off at 3:15 pm, which meant I could not work pass 4:40 pm and this included NOT doing a follow up drug tests AFTER 4:40 PM.

On January 26th, 2021, I had an unannounced follow up drug test in which I informed the female drug test examiner that I was hours of service and my time expires at 4:40 pm. She accused me of stalling the breathalyzer test and I immediately corrected her that I was not stalling any testing and I was just making her aware that I am an hours of service employee and my time expires at 4:40 pm in order to prevent an hours of service violation. She did the breathalyzer and I made a first attempt at 3:40 pm. I did not have to urinate and so we headed back to the Trainmaster's office and she documented the first attempt. After she documented this information, she reported it to her supervisor. Her supervisor then tells me on a speaker call that I have 3 hours to give a specimen from the first attempt at 3:40 pm and if I could not give a specimen then the MRO (Medical release Officer) would have me evaluated for a shy bladder in order to determine as to why I could not

give a specimen. After the drug test examiner's supervisor was done talking, the drug test examiner took her phone off speaker and she resumed her call and report. When she was finished with the call, I asked her to confirm that I am hours of service and must be released by 4:40 pm. She called the MRO, Andrew Collins and he informed her that I was not hours of service and that I must stay until I give a specimen or until 6:40 pm. Andrew Collins even told the assistant superintendent TC Williamson that hours of service does not apply with a last chance agreement. I immediately knew this was a violation of FRA hours of service and I did not want to receive a minimum $10,000 fine from the FRA and so I yelled for the manager on duty, Alton Lamontagne, to come into the trainmaster office and correct the misinformation the drug test examiner was given by the defendant. The drug test examiner repeated what Andrew Collins told her, which was I was not hours of service with a last chance agreement. Alton replied, is that new?!! The drug test examiner said I think so, that is what Andrew Collins told me over the phone just now. Alton replied, hum and left back out the trainmaster's office. I then reached to grab my phone from my work bag in order to contact my union representative CJ Auvil. The drug test examiner said I wasn't allowed to use my phone. I had never heard of this before, as the previous drug test examiners I have had took no exception to me using my cell phone during a follow-up drug test. I did not want to appear combative or incorporative and so I placed my phone back in my work bag. As I was sitting there waiting until I had enough urine to give for the test, I grabbed a bottle of soda from the side of my backpack. I was immediately told by the drug test examiner, I could not drink soda, only water. I placed the bottle of soda back in my bag and no water was made available to me as required according to the Amtrak Drug and Alcohol policy. The drug test examiner then asked me if I was ready to make a second attempt and I agreed to try. She escorted me back to the bathroom and I made a second attempt and I did not have to urinate. She then documented the second attempt and reported it to her supervisor. As she was on the phone with her supervisor, I pointed to my

soda bottle to ask her to ask her supervisor if I could drink soda. The supervisor replied yes, she doesn't have to drink just water, she can drink soda too. The drug test examiner said oh okay and allowed me to drink my soda from my work bag. As it is now 6:10 pm and I informed the drug test examiner that I am ready to submit a specimen because I feel like my bladder is full enough to give the needed amount. We completed the drug test and I was released at 6:40 pm. I asked Alton as I was leaving, what time it was so that there was no discrepancy in the time off duty and he said 6:40 pm; I will call PTT and make sure you get paid till 6:40 pm. I replied, okay, thank you and I left the crew base and immediately called my union representative CJ Auvil. CJ was flabbergasted at what I was telling him and I asked how do I submit my time card because I do not want get fined for this hours of service violation. CJ instructed me to put in the remark box, ordered to violate hours of service per MRO/DER Andrew Collins. (see attached) CJ then called Rick Pauli for reassurance that an hours of service violation had definitely occurred and Rick Pauli agreed it was a willful violation of hours of service.(see documents attached) I submitted my time card and it did not show as a violation because the willful violation of hours of service was hidden behind the deadhead train time on my time card labor category 78. The timecard showed me on my deadhead Marc train 424 until 6:40 pm when in actuality I was on that train until 3:13pm.(see attached violation) Marc Train 424 arrived into Baltimore two minutes early. I immediately informed CJ of the timecard manipulation and he was in disbelief. CJ immediately requested a copy of the manipulated time card and I sent him a picture of my January 26th, 2021 time card.

When I got off the phone with CJ, I was in a lot of physical knee pain as I struggled to walk to my vehicle. I was emotionally distraught, extremely fatigued and very angry at the retaliation I just endured by the defendant and his retaliatory actions. I was embarrassed and humiliated by the way I was treated in front of my coworkers and forced to violate hours of service. When I arrived home and tried to go to sleep I couldn't. I was emotionally distraught and I called family members and friends to vent,

cry, scream, yell and talk about what I just been put through after I got off my deadhead train. I finally fell asleep at 2:00 am and I woke up at 4:20 am. My job sign up time is 4:40 am and I overslept for work on 1-27-2021. I immediately called crew dispatch and marked off and they had a protect conductor on duty in Baltimore to work my job that day.

The following week, on February 04th, 2021, I received another follow-up drug test. I was instructed by TM Stencil to meet him in Baltimore when I get off Marc train 424. When Marc train 424 arrived at 3:15 pm I headed into the crew base. When I arrived into the crew room, numerous coworkers stared at me and shook their heads in disbelief. My coworkers made a comment out loud that I just had a drug test last week. I went into the drug testing room and I immediately asked the drug test examiner if she was familiar with hours of service and my time expires at 4:40 pm. She replied yes, I am familiar with hours of service; one time I had a group of 4 employees and they had 10 minutes left on duty and all I could do was their breathalyzers. I could not do their urinalysis. (see attached)  As she did my breathalyzer and I made my first attempt, I could not give a specimen. I prepared to gather my work bag and breathalyzer paperwork because it was almost 4:40 pm. The drug test examiner made numerous calls to TM Stencil cell phone for reassurance to release me and she kept getting his voicemail. She then made a call to her supervisor in regards to my hours of service and being released at 4:40 pm. She was receiving conflicting information on the phone and so I used my phone and emailed Rick Pauli about what was currently happening with the follow-up drug test. This particular drug test examiner took no exception with me using my phone. As the drug test examiner was on her phone, I looked at her and I asked her they finally telling you it is hours of service? She placed her index finger up to her lips and nodded up and down in a yes form. I said okay in a low tone. The drug test examiner then just had me print my name but not sign the urinalysis document because a specimen was not given. As she made another attempt to contact TM Stencil, it was unsuccessful and I left at

4:58 pm, 18 minutes after my time on duty expired. (see documents)

These (7) follow-up drug tests that occurred after my agreement expired May 08th, 2020 were unwarranted and in breach of the agreement I signed April, 2019. How can seven "follow-up" drug tests be performed on an agreement that was expunged, expired and removed from my file on May 08th, 2020?

How can a "follow-up" test be performed on an agreement that had been fulfilled and there is nothing to follow up on?

I knew then that I was being retaliated against by the defendant for numerous reasons. I knew then the defendant took exception to the whistle blowing when I wrote the CEO of Amtrak Richard Anderson and the lengths to which I went to retain a second return to work drug test in order to regain my employment. It was very obvious to me that the defendant took exception to Labor Relations, Rick Pauli and the Vice President of Labor Relations overriding his authority in the manner in which they did in order to get me a second return to work drug test.

I immediately filed an Amtrak DRO Report on February 04th, 2021 in regards to the defendant listed above as well as the other managers on duty when these (7) follow-up drug test occurred after the May 08th, 2020 expiration. In addition to the DRO report, I also filed an EEOC report for job discrimination. I received a rights to sue letter from EEOC on May 10th, 2021. (see enclosed)

After filing the Amtrak DRO report on February 04th, 2021, I received a call from Karen Bright, Amtrak compliance representative in Chicago, Illinois approximately 2 weeks later. Karen Bright called me on February 17th, 2021 and asked me what happened in regards to the Amtrak DRO report. I explained everything beginning with an email I wrote to management in November of 2017 about the unsafe, slippery conditions in regards to the platforms at West Baltimore passenger station. She

asked me who I emailed in management and I gave Karen Bright those managers' names. I then explained how my injury occurred one year and a month later on the very same platform I reported unsafe in an email to management. Karen expressed that had my unsafe concerns in regards to the platform had been addressed then it's possible that I may not have been injured. I then spoke to Karen about my return to work drug test at Concentra and how I did not wait for my bladder to be full enough and every time I went it wasn't enough for a 2-split valve test. I then explained how according to the 2017 Amtrak Drug and Alcohol policy, I am supposed to go back the next day for a second test but Andrew Collins denied me that opportunity and wanted me to go back for a shy bladder evaluation. Karen asked what was the difference between you going back for a shy bladder evaluation versus a second drug test? I said to Karen, you would have to ask Andrew that, I cannot answer that for him. Karen then informed that this agreement that you signed could have also been prevented had Andrew let you go back for the second return to work drug test. I agreed as well. Karen the explained to me that the reason that I received (7) follow-up announced drug tests after the agreement expired is because someone in the Amtrak Drug and Alcohol typed it into the computer incorrectly. It was typed in as if I were to be tested for (2) years instead of the (1) year and that was the mistake and it has since been corrected in the computer and that we have reached out to Right Care Day One. Karen asked me if that made sense and gave me some closure? I responded no and she asked why. I told her because I signed an agreement with (9) stipulations required of me to regain my employment and had I not adhered to what was required of me, I would have been returned to terminated status. Anyone who had access or a copy of this agreement should have referenced it as necessary when necessary. A typo DOES NOT excuse away or take away the intentional infliction of emotional distress, the retaliation I endured, the feelings of harassment and humiliation I experienced. I expressed to Karen Bright that I missed several water therapy /physical therapy appointments as a result of these excessive, unwarranted follow-up drug tests and because I

missed these pain management treatments, it made it extremely painful to work the next day. I expressed to Karen that there were times I had to wait 3 days to get water therapy/physical therapy treatments because they close at 1 pm on Fridays and they are closed on the weekend. So when I was given a follow-up test after the agreement expired on a Thursday, I didn't get pain management treatments till Monday, as a result causing a lot of pain in my knees to a point where it was extremely difficult to walk. Karen asked what was I looking for on numerous occasions throughout the call. I expressed to her that I do not want this to ever happen to another Amtrak employee ever again. The Amtrak Drug and Alcohol policy should be followed the way it is written and adhered to. Not selectively picked and chosen from according to how the Medical Release Officer feels on that particular day.

Karen also informed me that their was a meeting with management on February 12th, 2021 and their was no violation of hours of service. (see enclosed) She said that management told her FRA said they must change the code when an employee is doing a drug test. I did not respond or entertain her comments about hours of service violations and what she was told by Tracey Armstrong. I knew without uncertainty that (2) willful violations of hours of service occurred on 01-26-2021 and 02-04-2021 and Amtrak will receive FRA monetary fines for those willful violations as well as the manipulation of my timecard. (see enclosed)

Karen Bright then inquired as to if I reached out to Amtrak's EAP department because I have been through a lot. I replied NO because I do not trust the Amtrak EAP department. I have an outside emotional health counselor not affiliated with Amtrak whom I am currently still seeing because I still experience severe depression and anxiety behind all of this because this did not have to happen. I told Karen that I do not drink nor do drugs and I was coming back from a work injury not a RULE G violation. I told Karen Bright, I NEVER wanted SPECIAL TREATMENT! I ONLY wanted FAIR TREATMENT!

Karen Bright said she was going to reach out to the Amtrak Drug and Alcohol Department again and get a few more of her questions answered. She then asked if she could call me back sometime next week. I replied yes, that's fine. Karen Bright never called me back and the Amtrak DRO Report was closed 2 weeks later.

*[signature]*