**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1912

DAWN C. POLK

   Plaintiff - Appellant

v.

AMTRAK NATIONAL RAILROAD PASSENGER CORPORATION; ANDREW COLLINS, Amtrak D.ER; ALTON LAMONTAGNE, Roadforeman Manager; TRACEY ARMSTRONG, Trainmaster Manager

   Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland at Baltimore. Lydia Kay Griggsby, District Judge. (1:21−cv−01740−LKG)

Argued: March 9, 2023            Decided: April 26, 2023

Before WILKINSON, AGEE, and HEYTENS, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Heytens joined.

**ARGUED:** Denise M. Clark, CLARK LAW GROUP, PLLC, Washington, D.C., for Appellant. Alison Nadine Davis, LITTLER MENDELSON P.C., Washington, D.C., for Appellees. **ON BRIEF:** Rosa T. Goodman, LITTLER MENDELSON, P.C., Washington, D.C., for Appellees.

WILKINSON, Circuit Judge:

Congress enacted the Railway Labor Act (RLA), 45 U.S.C. §§ 151 *et seq.*, to curb disruption of the rail yards, tracks, and terminals that tie our economy together. As relevant here, the statute directs workers and carriers to resolve their differences through mediation and arbitration. But Dawn Polk, a rail worker, elected to sue her employer, Amtrak, in federal court. The district court, however, held that Polk's claims were subject to arbitration under the RLA. We agree and thus affirm the judgment.

I.

Dawn Polk, an African American woman, worked as a conductor for Amtrak National Railroad Passenger Corporation (Amtrak). During her employment, she belonged to a division of the Sheet Metal, Air, Rail and Transportation Workers (SMART) union, which maintained a collective bargaining agreement (CBA) with Amtrak.

In late 2018, Polk suffered an injury that caused her to miss multiple months of work. Before returning to the job, Polk was required to take a drug test in accordance with Amtrak's Drug and Alcohol-Free Workplace Program (Drug-Free Program). The Program specifies that "[a]ny employee returning to work after an absence of at least 30 consecutive days . . . must pass a [d]rug test before returning to work." J.A. 314.

On March 25, 2019, an Amtrak representative called Polk and asked her to take the drug test that day. Polk promptly went to the testing site but was unable to produce an adequate sample of urine during an allotted three-hour period. She then called Andrew Collins, Amtrak's director of employee relations, to ask to reattempt the test the following morning. According to Polk, Collins responded that "you don't get a second test" and

2

advised her to undergo a medical evaluation for shy bladder syndrome. J.A. 26. After Polk's subsequent assessment for shy bladder syndrome came back negative, Amtrak terminated her employment pending an investigative hearing.

A couple of weeks later, on April 19, Amtrak extended Polk a settlement offer via her union representative. Per the offer, which the parties refer to as "the Waiver," Amtrak proposed to reinstate Polk so long as she agreed to several conditions including that she waive her right to the investigative hearing. The Waiver also obligated Polk to see a substance abuse professional, undergo "unannounced drug and/or alcohol follow-up testing at least six (6) times for a period of twelve (12) months," and "waiv[e] all rights under the Collective Bargaining Agreement" in the event of a future violation of the Drug-Free Program. J.A. 55–56. Polk alleges that she signed the Waiver "under duress." J.A. 28.

Polk returned to work on May 8, six weeks after the initial drug test. She alleges that she received four drug tests over the following year, and then another seven tests in the year after that. As the tests continued into the second year following her reinstatement, Polk expressed concern to her union that Amtrak was testing her beyond the twelve-month period mentioned in the Waiver. Polk alleges that the added tests caused her embarrassment and interfered with her medical appointments.

In early 2021, Polk collected her concerns into a formal grievance that she filed with Amtrak's dispute resolution office. She alleges that she subsequently received a call from an Amtrak representative attributing the continued testing to a computer entry error. Polk further alleges that the representative "never called . . . back as promised" and failed to rectify the error. J.A. 32. Two months later, Polk retired from Amtrak on disability benefits.

3

In July 2021, Polk brought the instant lawsuit *pro se* in the District of Maryland. She named Amtrak and Collins as defendants, along with three other Amtrak colleagues, Alton Lamontagne, Curtis Stencil, and Tracey Armstrong. Polk asserted state-law claims of breach of contract and tort, as well as a federal claim of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* She requested $1.5 million in damages.

Defendants moved to dismiss, and Polk in turn moved for summary judgment as well as for leave to amend her complaint. In June 2022, the district court granted defendants' motion and denied Polk's two motions. It reasoned that the Railway Labor Act preempted Polk's state-law claims and precluded her federal Title VII claim because all of these claims would "require that the Court interpret the rights within the CBA" between Amtrak and SMART. J.A. 362.

Polk timely appealed.

II.

This appeal concerns the Railway Labor Act, which aims to "avoid any interruption to commerce" and "provide for the prompt and orderly settlement" of disputes between rail workers and carriers. 45 U.S.C. § 151a. In relevant part, the statute sets forth a detailed dispute-resolution procedure, culminating in arbitration, for conflicts "growing out of . . . the interpretation or application" of a collective bargaining agreement. *Id.* § 153 (first). Such conflicts are known as "minor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252–53 (1994); *see Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491

4

U.S. 299, 302 (1989) ("[M]ajor disputes seek to create contractual rights, minor disputes to enforce them.").

The Supreme Court has held that the RLA's arbitral procedure for minor disputes is "mandatory." *Hawaiian Airlines*, 512 U.S. at 252. Thus, minor disputes that are not resolved through an intra-carrier grievance procedure are to be referred to arbitration. For the hearing of these matters, the RLA created the National Railroad Adjustment Board, a specialized tribunal consisting equally of union and carrier representatives. 45 U.S.C. § 153 (first). Carriers and unions may also institute their own adjustment boards instead with a single representative from each side. *Id.* § 153 (second). To secure the RLA's arbitral procedure, the Supreme Court has ruled that the RLA preempts state-law claims that also constitute minor disputes. *Hawaiian Airlines*, 512 U.S. at 262–63.

III.

On appeal, Polk solely challenges the district court's holding that the RLA precludes her Title VII claim. At the dismissal stage, we review the district court's decision de novo. *AFSCME Md. Council 3 v. Maryland*, 61 F.4th 143, 148 (4th Cir. 2023). Polk argues that the RLA does not preclude her Title VII claim because the claim is not a minor dispute. She advances two arguments. First, Polk maintains that Title VII claims are "never" minor disputes because Title VII supplies an "independent" cause of action. Appellant Opening Br. at 4. Second, and in the alternative, Polk contends that at least her particular claim is not a minor dispute because it does not require the "interpretation or application" of a CBA. 45 U.S.C. § 153 (first). We address each of Polk's contentions in turn.

A.

Polk first argument is categorical. She contends that *all* Title VII claims are intrinsically different from RLA minor disputes because Title VII "rights are guaranteed to employees whether or not a collective bargaining agreement exists." Appellant Opening Br. at 9. Polk's proposition that a Title VII claim cannot be a minor dispute, however, runs headlong into Supreme Court guidance, circuit court precedent, and the congressional judgments behind the RLA. While Polk is entitled to seek a remedy for workplace discrimination, the RLA accords her the avenue for such relief in arbitration.

1.

The Supreme Court has indicated that federal claims, such as those arising under Title VII, can constitute minor disputes. On multiple occasions, the Court has explained that state causes of action can be minor disputes even though they can arise in the absence of a CBA. *Hawaiian Airlines*, 512 U.S. at 261–62; *Andrews v. Louisville & Nashville R. Co.*, 406 U.S. 320, 323–24 (1972). That Title VII is a federal statute makes no difference. For the Court has stated that the RLA's preemption inquiry for state claims and its preclusion inquiry for federal claims are founded upon common "principles." *Hawaiian Airlines*, 512 U.S. at 259 n.6. Whether in the preemption or preclusion context, "Congress considered it essential to keep [minor] disputes within the Adjustment Board and out of the courts." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 n.9. (1987).

Following the Supreme Court's guidance, we recently stated that a "federal claim" can double as a minor dispute—and thus be subject to RLA preclusion. *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 703 (4th Cir. 2023). Our sister circuits have largely agreed

6

when confronted with a smattering of nominally independent federal causes of action. *E.g.*, *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349 (5th Cir. 2008) (Title VII); *Brown v. Illinois Cent. R.R. Co.*, 254 F.3d 654, 668 (7th Cir. 2001) (Americans with Disabilities Act); *Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1415 (8th Cir. 1997) (Age Discrimination in Employment Act). The lesson from these cases is not that a federal claim will always be a minor dispute, but that, contrary to Polk's view, a federal claim can at times be one.

There is good reason not to carve out federal claims from the RLA's preclusive scope. Congress understood minor disputes—that is, disagreements over the "interpretation or application" of a CBA—to be destabilizing in and of themselves. *Hawaiian Airlines*, 512 U.S. at 252 (quoting 45 U.S.C. § 151a). The adjudication of minor disputes can determine prevailing CBA interpretations and therefore "govern future relations" between unions and carriers. *Slocum v. Delaware, L. & W.R. Co.*, 339 U.S. 239, 242 (1950). As a result, minor disputes have "long been considered a potent cause of friction leading to strikes." *Id.* By getting courts out of the business of interpreting CBAs, Congress sought to avoid "protracted railway labor disputes" that would adversely affect the national economy. *Fairbairn v. United Air Lines, Inc.*, 250 F.3d 237, 241 (4th Cir. 2001).

The RLA's rationale has little to do with whether a minor dispute arises from a contractual claim or some other cause of action under state or federal law. The end-result is the same: A minor dispute can be destabilizing because of its precedential implications

7

for a CBA. To mitigate that inherent risk, Congress opted for the centralized arbitration of minor disputes over their sporadic litigation all across the country.

This congressional decision was premised on the several advantages that adjustment boards have over courts. First, their members are "peculiarly competent" in that they "understand railroad problems and speak the railroad jargon." *Slocum*, 339 U.S. at 243–44. Second, centralization fosters "a desirable degree of uniformity" in CBA interpretations. *Id.* And third, the flexibility of arbitral procedure allows for greater delicacy and dispatch, reducing the likelihood of "strikes bringing railroads to a halt." *Nat'l Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 72 (2009).

Congress is, of course, welcome to pare back the RLA's "mandatory arbitral mechanism." *Hawaiian Airlines*, 512 U.S. at 252. But Title VII, the statute invoked by Polk, gives no indication that Congress meant to do that. The text of Title VII does not refer to, let alone repudiate, the RLA's "elaborate administrative procedures" for minor disputes. *Buell*, 480 U.S. at 562. And the broad reach of Title VII cautions against displacing other statutory procedures that are focused on a narrow problem. Title VII governs almost any entity country-wide "engaged in an industry affecting commerce" so long as it has fifteen or more employees. 42 U.S.C. § 2000e(b). In contrast, the RLA concerns itself with railroad companies and airlines. 45 U.S.C. § 151. As the "more specific statute," the RLA is therefore to "be given precedence over a more general one." *Busic v. United States*, 446 U.S. 398, 406 (1980).

In sum, we decline to unwind a nearly century-old statutory scheme without a clear congressional directive to do so. The mere fact that Polk's claim arises under Title VII does not disqualify that claim from being a minor dispute within the RLA's ambit.

2.

Polk protests that arbitration would render her Title VII rights "ineffective." Appellant Opening Br. at 4. But arbitration is no death knell. In extending an arbitral forum, the RLA serves not to deny Polk due process but to afford it.

Polk's skepticism of arbitration is, in any event, out of step with the views of Congress and the Supreme Court. The Supreme Court has discussed the benefits of arbitration in recent years within the context of the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* Congress's view, the Court explained, is that arbitration can offer "quicker, more informal, and often cheaper resolutions for everyone involved." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). In a string of recent cases, the Supreme Court has rejected state- and court-made exceptions to the FAA's strong presumption of arbitrability. *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1924 (2022); *Epic*, 138 S. Ct. at 1619; *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 239 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011). Under the Supreme Court's jurisprudence, there is no reason to fear that arbitration will not give "statutory antidiscrimination rights the full protection they are due." *Penn Plaza LLC v. Pyett*, 556 U.S. 247, 265 n.5 (2009).

Polk appeals to *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), but the Supreme Court has substantially narrowed and explicitly repudiated that decision. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991); *Penn Plaza*, 556 U.S.

9

at 265. The value of arbitration does not vanish simply because Polk raises a workplace discrimination claim. Polk's argument about the inefficacy of arbitration is but a riptide to the Supreme Court's admonition that "the advantages of the arbitration process [do not] somehow disappear when transferred to the employment context." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001).

While arbitration does not compromise Title VII protections, Polk's proposed rule would scuttle the RLA's continued operation. Any dispute about a disciplinary action can be reframed through artful pleading as a discrimination claim under Title VII. Thus, if Title VII claims are never minor disputes, workers will be able to "cavalierly bypass" the regular grievance process and arbitration and head straight to federal court merely by adding allegations of discrimination to a complaint. *Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1367 (4th Cir. 1989). This maneuver would not be difficult. But it would turn courts into adjudicators of first instance, whereas the RLA permits them to reverse adjustment board decisions only for lack of jurisdiction, failure to comply with RLA requirements, or taint of fraud or corruption. 45 U.S.C. § 153 (first). By blessing Polk's new strategy of artful bypass, we would be nullifying the RLA's emphatic preference for the arbitration of minor disputes.

The less disruptive alternative is for claims like Polk's to go to arbitration. Polk has already taken the first step by filing a grievance with Amtrak's dispute resolution office. She can ultimately make her case to an adjustment board, half composed of union representatives. 45 U.S.C. § 153. In addition, Amtrak has represented that Polk can raise her Title VII claim and obtain Title VII relief in the arbitral forum. Oral Arg. at 19:43.

10

Preclusion of a Title VII suit need not be the end of the story. Employees can still hold their carrier accountable for discriminatory conduct. The RLA charts the path to do so through arbitration.

B.

That Title VII claims can be RLA minor disputes does not end our analysis, since Polk also argues that at least her *particular* claim is not a minor dispute. As noted above, minor disputes "grow[] out of . . . the interpretation or application" of a CBA. *Hawaiian Airlines*, 512 U.S. at 252 (quoting 45 U.S.C. § 151a). Polk contends that her claim is not a minor dispute because the claim is limited to "Amtrak's discriminatory behavior and not the collective bargaining agreement itself." Appellant Opening Br. at 4.

We disagree. The thrust of Polk's Title VII claim is that Amtrak deviated from its policies when dealing with her. While Polk's allegations as to her own treatment are factual, those concerning Amtrak's policies directly implicate the relevant CBA between Polk's union, SMART, and Amtrak. That some of Polk's interpretive disagreements concern the Drug-Free Program does not alter the character of her claim because the Program is itself integrated with the CBA. Since Polk's Title VII claim requires the interpretation of a CBA, it is a minor dispute.

1.

The dispositive role of the CBA is illuminated by the substance of Polk's Title VII claim. A worker may prove a claim of racial discrimination under Title VII either through "direct" or "circumstantial" evidence. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983). Polk does not refer to her race or the race of her colleagues

11

in her complaint, apart from a conclusory statement that she was "discriminated against due to [her] race." J.A. 14. Her allegations of racial discrimination are "circumstantial." *Aikens*, 460 U.S. at 714 n.3.

To make out a prima facie case of Title VII discrimination in the absence of "direct evidence," Polk must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). As Polk herself appreciates, her claim thus necessitates a showing that she was "treated differently" than other Amtrak employees on account of her race. Appellant Opening Br. at 3. The concept of differential treatment, after all, implies a *difference*.

The problem for Polk is that evaluating her theory of differential treatment would require a court to interpret CBA provisions covering employee discipline and reinstatement. That is, Polk relies on her interpretation of these provisions as a stand-in for allegations about Amtrak's factual treatment of her similarly situated colleagues. She chiefly alleges that Amtrak broke its own rules when it (1) terminated her for failing to complete the initial drug test, and then (2) tested her "excessively" beyond the one-year period specified in the Waiver. J.A. 15, 25. Yet even assuming *arguendo* that these allegations could establish the element of differential treatment in a Title VII claim, they would still necessitate the "interpretation or application" of a CBA. *Hawaiian Airlines*, 512 U.S. at 252 (quoting 45 U.S.C. § 151a). Polk's claim is accordingly a minor dispute.

To begin, Polk contends that Amtrak's "policy" was to give workers who failed to complete a drug test a second chance, not to terminate them. J.A. 25. To determine whether Polk is correct, a court would need to examine the CBA because the Drug-Free Program explicitly delegates discipline for union employees to the "appropriate collective bargaining agreement." J.A. 320. In particular, Rule 25 of the CBA governs disciplinary measures. That provision spells out when and how Amtrak may discipline SMART members. It also describes what kind of offense would warrant taking an employee "out of service pending a trial and decision," as Polk was. J.A. 292. A court would have to construe Rule 25 to decide whether Amtrak strayed from its "policy" in disciplining Polk.

Polk maintains that Rule 25 does not cover her mere failure to complete a drug test. But her disagreement over the rule's proper "interpretation or application" is precisely the kind of minor dispute that the RLA reserves for adjustment boards. *Hawaiian Airlines*, 512 U.S. at 252 (quoting 45 U.S.C. § 151a). Absent examination of the CBA, it is impossible to say whether Amtrak's decision to terminate Polk was standard or an aberration.

Polk's second concern, related to the frequency of her drug tests, likewise hinges on the CBA. Her objection primarily concerns the seven drug tests she received *after* the twelve-month period mentioned in the Waiver. Polk's position is that other employees in her position were not tested so frequently under Amtrak's policy, and that she has therefore shown differential treatment.

But Polk was not a regular Amtrak employee for drug testing purposes during the relevant time period. She had already been terminated and reinstated for a Drug-Free

13

Program violation, which she admitted to as part of the Waiver. J.A. 55. For some employees, only the Drug-Free Program might have been relevant to determining Amtrak's policy for testing frequency. But for those in Polk's situation, the corresponding policy implicates not only the Program but also the CBA provisions that govern employee reinstatement.

Two CBA provisions, in particular, are critical to interpreting Amtrak's policy. Namely the "Rule G Bypass Agreement" and the "Prevention Program Companion Agreement" set forth reinstatement conditions for a worker following a drug violation. These provisions provide for "testing . . . for up to *two years*" and a "probationary basis for . . . *two years*" with "periodic alcohol and/or drug tests." J.A. 298, 300 (emphasis added). These two-year provisions could entirely account for Amtrak's allegedly excessive testing of Polk, which took place in the two years after her reinstatement. Whether these provisions applied to Polk and how they are to be reconciled with the one-year period mentioned in the Waiver are questions of CBA "interpretation or application" that constitute an RLA minor dispute. *Hawaiian Airlines*, 512 U.S. at 252 (quoting 45 U.S.C. § 151a).

2.

Polk tries to distance her interpretative assumptions from the CBA by isolating them within the Drug-Free Program. But, as an initial matter, the Drug-Free Program cannot be so cleanly removed from the CBA. To do so would divorce Polk's violation from Amtrak's remedy. Yet Polk's "refusal to test" under the Program would mean little detached from Amtrak's disciplinary action that resulted from it. Likewise, an understanding of the

14

Program's random testing policy would be incomplete without consideration of the CBA's reinstatement provisions that explicitly refer to drug testing. That clear lines between the CBA and Program are difficult to draw is typified by the Waiver, which led to Polk's reinstatement. Although Polk depicts the Waiver as a private agreement between her and Amtrak, it referenced the CBA and was addressed to and signed by Polk's union representative.

The separation Polk seeks further overlooks the fact that the CBA incorporates the Drug-Free Program. CBAs are not limited to their express terms. For a CBA is "not an ordinary contract," but a "generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Consol. Rail*, 491 U.S. at 311–12 (internal quotation marks omitted). A CBA therefore incorporates any "practice, usage and custom" which has been "acquiesced in by the [u]nion." *Id.* (internal quotation marks omitted); *see also Fry v. Airline Pilots Ass'n, Int'l*, 88 F.3d 831, 836 (10th Cir. 1996) (noting that CBAs may "implicate practices, procedures, implied authority, or codes of conduct that are part of the working relationship").

The Drug-Free Program encompasses an ensemble of practices and customs that became de facto working conditions for SMART members such as Polk. The latest version of the Program had been in effect since June 2017—almost two years before Polk's initial test. Its policies were no secret. In Polk's words, the Program was carried out with respect to "all Amtrak employees, contractors, volunteers, and applicants who have received a conditional offer of employment." Appellant Opening Br. at 11. Amtrak's actions would

15

almost inescapably be measured by its fidelity to or departure from the CBA and Drug-Free Program.

Polk provides no basis to believe that her union was unaware of or hostile to the Program's years-old policies. If anything, the fact that the CBA and Drug-Free Program cross-reference each other suggests that SMART knew of the Program and had negotiated suitable accommodations for its members.

This conclusion comports with the rationale for collective bargaining. A CBA "covers the whole employment relationship," *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 579 (1960), and for good reason. Workers support unions in the hopes of obtaining firm rights and protections. Unions and carriers devote substantial time and energy to negotiating comprehensive, amenable accords. The resulting CBAs are not meant to be brittle arrangements that labor or management can sidestep on a whim. The whole point is for CBA procedures to be put to workplace use. That really is all this case is about.

IV.

Based on the terms of the CBA, "the gravamen" of Polk's Title VII claim is that Amtrak "violated the CBA or improperly applied it." *Giles*, 59 F.4th at 703. She has therefore raised a minor dispute. To prevent minor disputes from becoming major ones, we hold that Polk's Title VII claim is subject to arbitration under the RLA. Polk does not challenge the other parts of the district court's holding on appeal, and we see no reason to disturb them. We therefore affirm the judgment of the district court.

*AFFIRMED*